## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-00461-RMR-KLM

RUSSELL STRONG,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER;
ADAM BOLTON, in his individual capacity,

     Defendants.

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND
---

Plaintiff Russell Strong, by and through his attorneys Matthew J. Cron, Felipe Bohnet-Gomez, Ciara Anderson, and Siddhartha H. Rathod of RATHOD | MOHAMEDBHAI LLC, respectfully alleges as follows:

## I.    <u>INTRODUCTION</u>

George Floyd was killed by Minneapolis police officers on May 25, 2020. His death sparked global protests against police violence and systemic racism. In Denver, the George Floyd Protests (the "Protests") began on May 28, 2020 and continued day after day for weeks. Although the protesters were overwhelmingly peaceful, the Denver Police Department ("DPD") and officers from collaborating jurisdictions under DPD's authority and control (collectively, "Officers in Denver") responded with unimaginable force.

Undeterred by constitutional constraints, Officers in Denver routinely and customarily employed substantial force, including deadly force, against protesters without any legitimate law enforcement purpose, without issuing warnings, and without providing any opportunity for protesters to protect themselves from harm. Officers in Denver sadistically fired their "less-lethal"[1] weaponry at the most vulnerable body parts of protesters, including at their heads. Scores of civilians were badly injured during the Protests; many ended up needing surgery or other emergency medical services. Hundreds of complaints arising out of the Protests have been filed with DPD's internal affairs bureau, and over twenty individuals have already sought relief in federal court. Yet, despite the bloody carnage, Officers in Denver were cheered on by Denver policymakers who publicly acclaimed their lawless behavior.

But the days of unchecked violence perpetrated by Officers in Denver failed to quell the Protests. Despite knowing they would face such state-sponsored violence, courageous Coloradans risked grievous physical and emotional injuries to stand up for the cause of equality. One such person was Plaintiff Russell Strong.

In the afternoon of May 30, 2020, Mr. Strong went to Civic Center Park in Denver, Colorado to attend a demonstration. Mr. Strong held a sign adorned with a peace symbol on one side and the words "No Justice, No Peace," on the other.

On May 30, 2020, however, Officers in Denver desecrated the First Amendment by suppressing the rights of free speech and peaceful assembly with extreme violence. Without even giving warning, Officers in Denver opened fire on the demonstrators.

---

[1] To be clear, "less lethal" is a misnomer as such weaponry has been known to cause death and serious bodily injury. Indeed, as alleged below, Denver policy recognizes that "less lethal" force when targeted at a restricted area constitutes lethal force.

Defendant Officer Bolton took aim, fired, and shot Mr. Strong in the head with a 40mm "eXact iMpact" Sponge Round, a type of Kinetic Impact Projectile ("KIP").  The impact knocked Mr. Strong to the ground and blood began flowing from his eye socket.

Mr. Strong was taken to the Denver Health Medical Center.  Mr. Strong underwent emergency surgery in an attempt to repair his right eye.  However, the damage was too great and Mr. Strong's eye could not be saved. On June 4, 2020, Mr. Strong's eye was surgically removed. In addition, he required reconstructive surgery to repair broken bones in his face and eye socket.



*Mr. Strong's injuries following his discharge from the hospital*

This lawsuit seeks to hold Denver and Officer Bolton accountable for the multiple violations of Mr. Strong's constitutional rights and the grievous injuries he suffered.  Yet, like other litigants who have brought claims arising out of the Protests, Mr. Strong also seeks injunctive relief to prevent the DPD from using force against peaceful protesters in the future.  Justice demands no less.

## II.    JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b). All parties reside in this judicial district, and all of the events and omissions alleged herein occurred within the State of Colorado.

## III.    PARTIES

3.      Plaintiff Russell Strong is a citizen of the United States and a resident of the state of Colorado.

4.      Defendant City and County of Denver ("Denver") is a Colorado municipal corporation.

5.      The Denver Police Department ("DPD") is an agency of Defendant Denver, and all actions of the DPD are the legal responsibility of Defendant Denver.

6.      At all material times, Defendant Denver was responsible for supervising, enacting, and enforcing DPD's conduct, policies and practices, and for the hiring, retention, supervision, and training of employees and agents of DPD.

7.      Defendant Denver's policies, customs, patterns, and/or practices caused the deprivation of Plaintiff's constitutional rights.

8.      In responding to the Protests, Defendant Denver requested the assistance of other law enforcement agencies, including the Aurora Police Department. Responding law enforcement agencies were under the command of the DPD, and officers from such agencies were acting with the tacit or express authorization of the DPD.  Thus, Defendant Denver was responsible for the actions of other law enforcement who were policing the streets of Denver with the DPD's authorization and under its control.

9.      At all relevant times, Defendant Officer Adam Bolton was an officer employed by the DPD.

10.     Defendant Officer Bolton is responsible for the damage and injuries caused to Plaintiff.

11.     At all relevant times, Defendant Officer Bolton was acting under color of state law in his capacity as a law enforcement officer.  Defendant Officer Bolton is sued in his individual capacity.

12.     Defendant Officer Bolton's unconstitutional and unlawful conduct was caused by the customs, policies, practices, and/or procedures of Denver and the DPD.

## IV.     FACTUAL ALLEGATIONS

**A.      General Allegations Relating to the Denver Protests**

13.     On May 25, 2020, Minneapolis police officers killed George Floyd, sparking global protests against police violence and systemic racism.

14.     The Protests quickly spread to Denver, Colorado, where protests continued day after day for weeks beginning on May 28, 2020.

15.     Although the Protests were ignited by George Floyd's murder, racial inequity in policing is an issue long plaguing the DPD, the Denver Sheriff Department, and other Metro-area law enforcement agencies.

16.     The DPD and other Metro-area law enforcement agencies (many of which aided the DPD in suppressing the Protests), have repeatedly brutalized people of color with impunity and without criminal consequence.

17.     From Marvin Booker (d. 2010) to Michael Marshall (d. 2015) to Naeschylus Carter-Vinzant (d. 2015) to Jessica Hernandez (d. 2015) to Elijah McClain (d. 2019), Denver law enforcement officers and those from other Metro agencies have a lamentable history of killing persons of color without facing any criminal consequence.

18.     Denver's racist policing is not a figment of anecdotal selection; rather, it is borne out by statistical evidence.  Denver law enforcement officers disproportionately use force against Black people.  Black people made up 27% of the 1,191 documented uses of force by the DPD, in a city where only 10% of the population is Black.

19.     The racial disparities in usages of force are consistently high against Black people year after year in Denver.

20.     Given this history, it is unsurprising that the Protests inspired many Denverites to protest this racially tiered system of justice.

21.     Denver has hosted numerous large demonstrations over the years and the DPD has ample experience policing large crowds.

22.     However, as the Denver Office of the Independent Monitor ("OIM") observed, prior large-scale demonstrations were fundamentally different as those demonstrations "were not *about the criminal justice system or the police.*"

23.     The OIM further observed, "police tend to respond to demonstrations about police brutality more aggressively than they do to protests with other messages, making arrests and using force at greater rates."

24.     The OIM also noted that "protests about police conduct also pose a risk that officers will seek to punish protestors for speech that officers find offensive or objectionable."

25.     During the Protests, Officers in Denver habitually punished protesters for speech that was critical of law enforcement by using violent tactics against them. Officers in Denver, dressed in riot gear, employed a multitude of different "less lethal" weapons, including tear gas and smoke cannisters, grenades including flash bangs and rubber-pellet grenades, and kinetic impact projectiles ("KIPs") of various kinds, including rubber and foam bullets, beanbags, and pepper balls, to harm and subdue peaceful protesters.

26.     Beginning on May 28, 2020, protesters assembled at or near the Colorado State Capitol Building and the surrounding areas.  Protesters held signs, chanted, and marched to express their outrage with the status quo in policing and their desire for reform.

27.     On May 28, 2020, a crowd began to form around 5 p.m. near the Colorado State Capitol Building.

28.     As night approached, the DPD determined that it needed additional officers and placed a city-wide call for assistance.

29.     Approximately 150-200 DPD Officers ended up responding to the Protests on May 28, 2020.

30.     DPD Officers suppressed the Protests on May 28, 2020 with force, as they would repeatedly do throughout the first five days of the Protests.

31.     The force used by DPD Officers on May 28, 2020 was so overwhelming that by 10:30 p.m., officers began reporting that they had exhausted their supplies of certain less-lethal munitions, and they requested resupplies from neighboring jurisdictions.

32.     Numerous civilians were injured by the DPD Officers, many badly, on May 28, 2020.

33.     The Protests continued the next day, May 29, 2020.  On that date, the DPD began requesting assistance from neighboring law enforcement agencies.  At least one agency responded that night with officers.  The police officers again injured numerous civilians, many badly, on May 29, 2020.

34.     On May 30, 2020, Denver Mayor Hancock imposed a citywide curfew between 8 p.m. and 5 a.m. that was to last until June 1, 2020.

35.     Although scores of civilians had been injured due to police violence, and the Protests showed no signs of abating, Denver refused to take any measures to curtail the use of force by Officers in Denver.

36.     Instead, Denver readied the Officers in Denver for war.

37.     To arm the Officers in Denver, the Colorado State Patrol flew an airplane to Wyoming to retrieve munitions directly from a manufacturer.

38.     Denver reinforced its ranks through its requests for assistance from neighboring jurisdictions, such that approximately 450-500 Officers in Denver patrolled the streets on May 30, 2020.

39.     In sum, despite the bloody first two days of the Protests, Denver doubled down on responding to peaceful protests with force, leaving countless civilians injured for the offense of exercising their First Amendment rights.

40.     The Honorable R. Brooke Jackson of the United States District Court for the District of Colorado, after reviewing video taken at various times during the Protests, stated that "[t]hose videos show that the officers had ample time for reflection and were not dealing with dangerous conditions.  Named plaintiffs were attacked with rubber bullets, tear gas, etc., allegedly solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render treatment to injured protesters."

41.     This Complaint is one of many lawsuits filed against Denver in federal court for its and its officers' unconstitutional conduct during the Protests.  *See, e.g., Acker v. City & County of Denver, et al.*, No. 20-cv-03155; *Black Lives Matter et al., v. City & County of Denver, et al.*, Case No. 20-cv-01878, *Cruz et al. v. City & County of Denver*, No. 20-cv-01922, *Abay, et al. v. City & County of Denver*, Case No. 20-cv-01616; *Cousik et al. v. City & County of Denver,* Case No. 22-cv-1213.

42.     In these lawsuits, over a hundred individuals have brought federal claims against Denver and Officers in Denver.

43.     At least fifty additional notices of claims have been served on Denver. Many of these notices of claims involve serious bodily injury to protesters, including grievous eye injuries and ligament damage resulting from less-lethal projectile strikes.

44.     More than one hundred investigations have been opened by the Internal Affairs Bureau, and the Denver Office of the Independent Monitor submitted numerous other body-worn camera footage for the DPD to review for potential violations.

45.     On March 25, 2022, after the close of a three-week trial, a federal Jury returned a $14 million verdict against Denver in cases stemming from the police response to the George Floyd Protests. The Jury found that Denver had an unconstitutional policy, practice or custom of using excessive force against protesters and violating their First Amendment rights, that Denver's failure to train its officers had caused protesters' First and Fourth Amendment rights to be violated, and that Denver had ratified its officers' constitutional violations.

**B.     Weapons Used During the Protests**

46.     Officers in Denver used a multitude of different Kinetic Impact Projectiles ("KIPs") against peaceful protesters during the Protests.[2]  These KIPs included foam bullets, beanbag rounds, pepper balls, and tear gas canisters.

47.     It is extremely common for KIPs to cause contusions, abrasions, and hematomas.  Additionally, blunt impact may cause internal injuries.

48.     Fatalities may occur when a KIP strikes the head, neck, or precordium (the region of the chest immediately in front of the heart).

_____

[2] Officers in Denver employed other forms of non-lethal weaponry in addition to KIPs.  As Mr. Strong was injured by a KIP, however, this Complaint only includes allegations relating to the use of KIPs.

49.     According to a systemic review of available scientific literature, three percent of those injured by KIPs died from their injuries.  Fifteen percent of 1,984 people studied were permanently injured by them.

50.     Officers in Denver used 40mm launchers to shoot various types of KIPs.

51.     DPD officers used 40mm launchers to launch foam bullets, sometimes referred to as rubber bullets, at protesters, which are solid, spherical, cylindrical projectiles typically used to incapacitate a person and are known to cause bruising and welts.

52.     One such 40mm munition, the 40mm "eXact iMpact" Sponge Round, is "spin stabilized" for accuracy, and has an effective range of 120 feet.

53.     A 40mm launcher fires a round at a velocity of 295-325 feet per second. Impact from these rounds can cause bruising swelling, lacerations, critical eye injuries, and skull fractures.  The manufacturer warns that 40mm launchers are to be used only by trained law enforcement, corrections, and military personnel and may cause serious injury or death.

54.     DPD's department-issued 40mm launchers are equipped with rifled barrels and aiming devices.

55.     According to DPD's own training materials, the 40mm launcher is "very accurate."

56.     Prior to using a 40mm launcher, DPD requires its officers to successfully complete a certification process that consists of classroom instruction as well as a practical qualification, which involves target practice with the 40mm launcher.

57.     Officers in Denver used 40mm launchers to fire numerous types of KIPs not approved for use by the DPD, including rubber-ball rounds and beanbag rounds.

58.     Several types of KIPs contain rubber balls.  Rubber-ball rounds often contain approximately 180 rubber balls that travel at a velocity of 280-330 feet per second.

59.     A manufacturer of rubber-ball rounds warns that this munition can cause "serious bodily injury or death."  It also cautions that "[d]ispersion of the projectiles creates a greater risk of eye injury."

60.     40mm launchers were also used by Officers in Denver to fire beanbag rounds, which are generally filled with #9 lead shot.

61.     One manufacturer warns that "[s]hots to the head, neck, thorax, heart, or spine can result in fatal or serious injury."

62.     Although not used by DPD officers, other Officers in Denver also used less-lethal shotguns to shoot KIPs.  Less-lethal shotguns are generally less accurate and have a shorter effective range than 40mm launchers.

63.     Munitions manufacturers warn that less-lethal shotguns can cause serious bodily injury and death.

64.     According to the American Academy of Ophthalmology, at least twenty people across the country suffered severe eye injuries during the protests, and at least seven people have lost an eye.

65.     Describing the impact of a KIP striking the eye, Dr. George A. Williams, a board member of the board of trustees of the American Academy of Ophthalmology, stated "[i]t's analogous to taking a grape and hitting it with a hammer."

66.     Under DPD policy, the targeting of an individual in a "restricted area" with a 40mm KIP is treated as deadly or lethal force.

67.     The restricted areas are the head, eyes, throat, neck, breasts of a female, genitalia, pelvis, or spinal column.

68.     Use of a 40mm KIP on these restricted areas of an individual carries a significant risk of causing serious bodily harm, including death.

69.     Use of a 40mm KIP on the restricted areas of an individual is deadly or lethal force.

**C.      Officers in Denver Employed Excessive, Deadly Force Against Russell Strong**

70.     Starting in the early afternoon on Saturday, May 30, 2020, protesters assembled at and around Civic Center Park in Denver, Colorado.

71.     Mr. Strong arrived at Civic Center Park a few hours after the protest began.

72.     Mr. Strong carried a homemade sign that read "No Justice No Peace" on one side, and a peace symbol on the other side.  At the time he was shot, the peace symbol was facing Officers in Denver.

73.     In the late afternoon, a little before 7:00 p.m., a police line formed along Colfax Avenue between Broadway and Lincoln.

74.     The police line formed at least an hour before Denver's curfew was set to begin.

75.     The police line included officers from, at minimum, the DPD and the Aurora Police Department.

76.     In particular, officers from DPD's gang unit formed a skirmish line in the intersection of Colfax and Lincoln, facing south towards the protesters in Civic Center Park.

77.     The DPD gang unit affixed red tape to the back of their helmets to identify themselves during the George Floyd Protests.

78.     On May 30, 2020, several DPD gang unit officers, including Defendant Officer Bolton, were equipped with 40mm launchers.

79.     In the minutes following 7:00 p.m. on May 30, 2020, the protesters in the vicinity of Colfax and Lincoln were peacefully assembled.

80.     At approximately 7:06 p.m., an individual wearing black clothing and carrying a bucket in his right hand attempted to walk across Lincoln street in front of the DPD gang unit skirmish line. As he crossed in front of the officers, he was sprayed with OC spray, without apparent justification, by a DPD gang unit officer.

81.     The unprovoked use of force drew the protesters' attention, and they began yelling in protest.

82.     Moments later, officers deployed flash bang grenades and other munitions on the crowd.

83.     One of the protesters read excerpts of the United States Constitution aloud with a blowhorn.

84.     Many of the protesters in the crowd were actively encouraging their peers to keep the protest peaceful.

85.     Several protesters stood approximately fifteen feet from the police line with their hands up.

86. Other protesters knelt on the ground in front of the officers, with their hands raised.

87. Just behind the kneeling protesters, other civilians displayed signs, including Mr. Strong, who held aloft his homemade sign with both hands, with the peace symbol facing the police line.

 

*Mr. Strong holding his sign before officers shot him in the face.*

88. As shown from the pictures above, the crowd was sparse and non-threatening.

89. Mr. Strong did not threaten or display any aggression towards Officers in Denver, let alone "active aggression" as that term is defined in the DPD's Use of Force Policy.

90.     No person near Mr. Strong threatened or displayed any aggression towards Officers in Denver, let alone "active aggression" as that term is defined in the DPD's Use of Force Policy.

91.     Nevertheless, around 7:08 p.m., without provocation or warning, Officers in Denver deployed additional flash bombs, tear gas, and KIPs at the demonstrators, including at Mr. Strong.

92.     Officers in Denver did not provide any dispersal orders prior to using force on May 30, 2020 at the incident where Mr. Strong was shot.

93.     When the individuals who had been kneeling with their hands up turned to retreat, Officers in Denver shot them in their backs as they attempted to run away.

94.     For the officers on the scene, this was target practice.

95.     Officer Bolton targeted and shot Mr. Strong in the face with a 40mm "eXact iMpact" Sponge Round.

96.      Officer Bolton's body worn camera was turned off, and therefore did not record his use of force against Mr. Strong.  However, Officer Bolton's shooting of Mr. Strong is captured by other video footage.

97.     The force of Officer Bolton's shot knocked Mr. Strong instantly to the ground.  He instinctively covered his face with his hands, and blood began gushing through his fingers.

98.     Other civilians observed Mr. Strong laying on the ground with an obvious facial wound and they yelled towards the police line that there was an injured person who needed immediate medical attention.  The police ignored their pleas for help.

99.     Neither Officer Bolton nor any other officer examined Mr. Strong's injuries after he was hit with the 40mm projectile.

100.    Neither Officer Bolton nor any other officer requested medical attention for Mr. Strong.

101.    Neither Officer Bolton nor any other officer mentioned the use of force against Mr. Strong, or his injury, in any report or written statement.

102.    Neither Officer Bolton nor any other officer made any effort to arrest Mr. Strong or otherwise place him in custody.

103.    Seeing no reaction from the officers, several civilians courageously picked Mr. Strong up and carried him towards the police line, ducking fire along the way.  They laid Mr. Strong on the ground so that he could receive medical attention from EMTs who were on the scene.

104.    Mr. Strong was put in an ambulance and taken to the Emergency Department at Denver Health Medical Center.

105.    After Mr. Strong was transported from the scene, the officers in the police line continued to indiscriminately fire their weapons in the direction of anything or anyone that moved.

106.    The officers were not worried about hurting protesters and did not care about the people that they were injuring.

107.    A professional photojournalist who has covered countless riots, protests, and news stories during a twenty-plus year career witnessed the shooting of Mr. Strong. The photojournalist attests that he had "never seen anything that remotely compares to

the display of hostility and use of force I observed from police officers while attending the George Floyd protests in Denver, Colorado on May 30, 2020."

**D.     Mr. Strong's Grievous Injuries**

108.    Upon being struck by the projectile, Mr. Strong instantaneously felt excruciating pain in his right eye and could not see.

109.    Medical professionals were initially unable to completely assess Mr. Strong's right eye due to the amount of swelling and blood.

110.    Mr. Strong was preliminarily diagnosed with a ruptured right eye globe due to blunt trauma.

111.    CT scans of Mr. Strong's eye sockets, eyes and surrounding bones confirmed that Mr. Strong's right globe was ruptured and revealed that all four orbital walls were fractured with significant displacement of the right orbital floor.

112.    Mr. Strong also suffered numerous facial fractures effecting his facial symmetry and breathing, including fractures of the right anterior maxillary sinus, zygomatic arch and nasal bone.

113.    On May 31, 2020 at 12:31 a.m., a superior conjunctival peritomy was performed on Mr. Strong's right eye in an attempt to repair the ruptured globe.

114.    This surgery attempted to reform Mr. Strong's eye. However, due to extensive damage to the ocular tissues and absence of light perception, Mr. Strong's eye was determined to have a poor prognosis and was ultimately deemed irreparable.

115.    On June 2, 2020, a CT 3D Reconstruction was performed to assess Mr. Strong's facial fractures and prepare for a facial reconstruction surgery to restore Mr. Strong's facial symmetry and breathing.

116.    On June 4, 2020 Mr. Strong's right eye was surgically removed through an enucleation of the right globe and a naso-orbital fracture reconstruction was performed to repair the orbital blow out and displaced nasal fractures.

117.    Following enucleation, a prosthesis was placed and secured in Mr. Strong's eye socket to maintain the eye's structure.



*Mr. Strong following the removal of his right eye and facial reconstructive surgery.*

118.    The harm to Mr. Strong from losing his right eye has been profound and has negatively impacted nearly every facet of his life.

119.    Among other things, the loss of Mr. Strong's eye negatively affects his depth perception, spatial recognition, peripheral vision, and ability to see in the dark.

120.    As a talented amateur artist, Mr. Strong's reduced sense of depth perception and overall vision makes it more challenging for him to create art.

 

*Mr. Strong's Artwork, Pre-Shooting*

121.    Mr. Strong's injuries impact his ability to engage in activities of daily life, ranging from driving to shaking hands.  For example, Mr. Strong cannot even play catch with his niece and nephew anymore.

122.    Mr. Strong has also suffered significant emotional injuries as a result of Defendants' unconstitutional use of force against him.

**E.    Allegations Relating to Municipal Liability**

> ***i.    Officers in Denver Intentionally and Customarily Shot Protesters (as well as Bystanders) in the Head with KIPs***

123.    Between May 28, 2020 and June 5, 2020 (when the Honorable R. Brooke Jackson placed restrictions on Officers in Denver's ability to use force against protesters

via a temporary restraining order), Officers in Denver indiscriminately shot hundreds, if not thousands, of civilians with highly dangerous, potentially deadly KIPs.

124.    Prior to Judge Jackson's temporary restraining order, Denver and its policymakers had failed to curtail the unconstitutional usages of force by Officers in Denver or otherwise restrict their use of KIPs against peaceful demonstrators.

125.    Prior to Judge Jackson's temporary restraining order, Officers in Denver fired KIPs directly at protesters without warning, without issuing any orders to disperse, and without giving protesters opportunity to disperse.

126.    As Judge Jackson found, Officers in Denver's use of force routinely occurred during situations when Officers in Denver had ample time for reflection and were not dealing with dangerous conditions.

127.    Officers in Denver routinely targeted the heads of demonstrators with KIPs, which markedly increased the danger posed by such projectiles, and constituted the use of deadly force under Denver policy.

128.    Given the routine targeting of peaceful protesters by Officers in Denver, the shooting of Mr. Strong in the face with a KIP was not an isolated incident.  Rather, Mr. Strong was just one victim of many who were shot in the head, neck, face, and chest with KIPs by Officers in Denver during the Protests.  For example:

129.    On May 28, 2020, Officers in Denver shot Michael Acker in the face with a 40mm baton round without warning.  The KIP struck Mr. Acker in his right eye, shattering the glass eye piece in his gas mask.  Mr. Acker's face looked this after being shot:



*Michael Acker*

Mr. Acker was transported to Denver Health via ambulance.  He received seven stiches to close a wound on his forehead, two stitches to close a wound on his nose, and three stitches to close a wound on his upper eyelid.  Mr. Acker would likely have lost his eye had he not been wearing a gas mask, and he suffered vision problems afterward.

130.    On May 29, 2020, in the afternoon, Officers in Denver shot Megan Matthews in the head with a KIP without warning while she was participating in a peaceful protest near the Capitol.  Ms. Matthews was knocked unconscious by the KIP and described feeling as if her "head was blown off."  When she woke up, her face was covered in blood.  Ms. Matthews suffered a broken nose, fractured facial bones, and multiple lacerations on her face.  Ms. Matthews face looked like this:



*Megan Matthews*

131.    On May 29, 2020, a credentialed cameraman for KMGH-TV/Channel 7 was struck four times in the chest by KIPs fired by Officers in Denver without warning. An additional KIP struck his camera, which had been held head level.  The camera looked like this:



132.    On May 29, 2020, Officers in Denver shot Gabriel Thorn in the head with a KIP without warning.  Mr. Thorn was acting as a medic and wearing a helmet.  Mr. Thorn wore a red cross on his helmet and backpack to indicate that he was providing medical aid.

133.    On May 29, 2020, Officers in Denver shot Andy Sannier in the chest with a KIP without warning.  Mr. Sannier was on his way home that evening when he stopped to record an encounter with his cell phone.  Seeing him filming him, Officers in Denver opened fire and shot Mr. Sannier in the chest.

134.    On May 30, 2020, Officers in Denver shot Michael McDaniel in the head with KIPs without warning.  Like Mr. Thorn, Mr. McDaniel was serving as a medic and was fortunately wearing a helmet when he was shot in the head with KIPs.:

135.    On May 30, 2020, Officers in Denver shot Elizabeth Epps in the face with a KIP without warning.  A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face.  Ms. Epps' face looked like this:



*Elizabeth Epps*

136.    On May 30, 2020, Officers in Denver shot Jax Feldmann in the eye without warning.  Mr. Feldmann was not protesting but simply returning home when an officer riding on the back of a DPD truck fired a projectile at his face, blinding him in one eye.  Mr. Feldmann may need to have his eye removed.  Mr. Feldmann's injuries looked like this:



*Jax Feldmann*

137.    On May 30, 2020, Officers in Denver shot Shawn Murphy in the face with a KIP, without warning, while he was peacefully protesting.  Mr. Murphy had been wearing swim goggles and believed that he would have lost his eye absent that protection.  Mr. Murphy needed emergency surgency to save his retina and his vision remains blurry.  Mr. Murphy looked like this:



*Shawn Murphy*

138.    Alex Wolfson was skateboarding during the May 30, 2020 weekend.  Mr.
Wolfson stopped to observe the Protests when he was suddenly struck in the eye by a
projectile, without warning.  Mr. Wolfson could not see out of his eye and there was
blood in his hand.  Mr. Wolfson needed surgery from an emergency retina specialist in
order to regain vision in his eye.  Mr. Wolfson looked like this:



*Alex Wolfson*

139.    Nicholas Orlin was marching, chanting, and singing during the Protests while wearing a bike helmet.  Mr. Orlin was located near the intersection of Colfax and Lincoln on the evening of May 30, 2020, near where Mr. Strong was protesting. When he attempted to block a gas canister that had been thrown near him with a traffic cone, he was struck in the head with a KIP.

140.    Upon information and belief, Mr. Orlin was intentionally shot in the head with a 40mm launcher by an officer from DPD's gang unit around 6:30 p.m. on May 30, 2020.

141.    He suffered several fractures along the base of the eye and there is an increased likelihood that he may develop glaucoma because his eye is not draining properly.  Mr. Orlin looked this this:



*Nicholas Orlin*

142.    On May 31, 2020, Gabe Schlough was shot in the face and chest with KIPs by Officers in Denver without warning.  The shot caused a gaping wound on his chin that required 22 stitches to close.  Mr. Schlough had been aiding a woman who

had been shot in the chest with a tear gas canister.  Mr. Schlough still experiences pain from this would and he will likely require plastic surgery for it to heal properly.   Mr. Schlough looked like this:



*Gabe Schlough*

143.    On May 31, 2020, Zachary Packard was shot in the head by Officers in Denver with a KIP without warning.  The impact rendered him immediately unconscious. When he regained consciousness, a friend took Mr. Packard to the hospital where a CT scan revealed that he had suffered a fractured skull and jaw, two fractured discs, and bleeding in his brain.  Mr. Packard was hospitalized for about one week.  Here is Mr. Packard at the hospital:


*Zachary Packard*

144.    On May 31, 2020, Yousef Amghar was shot in the head and chest with KIPS by Officers in Denver without warning.  He had been standing with his hands up and was in a group chanting "hands up, don't shoot."

145.    On May 31, 2021, Alex Burness of *The Denver Post*, was shot in the head and abdomen with KIPs without warning.  Officers in Denver began shooting at Mr. Burness just after he yelled out "Press!"

146.    On May 31, 2020, Officers in Denver shot Darian Tindall in the chest with KIPs without warning.  Ms. Tindall's hands were above her head when she was shot, and she did not see the projectile coming or anticipate the intense pain.

147.    On May 31, 2020, Officers in Denver shot Trevor Hughes with KIPs without warning.  Mr. Hughes was photographing and recording the protests, holding the camera near his face when he was shot at.  One KIP struck Mr. Hughes in the hand, which broke and severed Mr. Hughes' right ring finger.  Mr. Hughes' finger needed to be surgically repaired.

148.    On May 31, 2020, Officers in Denver shot Ambrose Cruz in the head and chest with KIPs without warning while he was peacefully protesting.  Mr. Cruz was struck at least three times in the eye area, knocking off his glasses.  Mr. Cruz's eye was bleeding, swollen shut, and bruised.  A month after the attack, he still had light sensitivity and other problems with his eyesight.

149.    On June 2, 2020, Officers in Denver shot Darrell Hampton in the face with KIPs without warning while he was peacefully protesting.  Mr. Hampton was simply standing on the sidewalk filming the protest when one officer decided to shoot Mr. Hampton in the face.

### ii.    Officers in Denver Customarily Employed Force Against Protesters Without Warning or Providing an Opportunity for Protesters to Disperse, in Violation of Policy

150.    As described herein, Officers in Denver engaged in repeated and ubiquitous violations of law by using force to suppress peaceful demonstrations in retaliation for their protected First Amendment activities.

151.    Under existing law, police may not disperse protests simply because they fear potential disorder.

152.    DPD Policy provides that "[a]n order to disperse should not be made unless supported by an applicable municipal ordinance or state statute."

153.    Yet, Officers in Denver regularly used force to disperse peaceful protests when there was not *even* reason to fear potential disorder, nor any lawful reason to disperse such crowds.

154.    DPD Policy requires that DPD officers record dispersal orders and document them in writing.

155.   DPD Policy instructs that a loudspeaker or public address system should always be used to increase the likelihood that all crowd members can hear police commands.

156.   Unless there is an imminent threat, dispersal orders should be given and repeated at least three times, and, if possible, from a variety of locations.

157.   Dispersal orders must include dispersal route information and warnings that the refusal to comply shall subject participants to force and arrest.

158.   Only when voluntary compliance with dispersal compliance has not been obtained, are dispersal tactics, including the use of less-lethal munitions, to be used.

159.   DPD's policies with respect to dispersal orders recognize that the optimal way to diffuse a crowd in a safe and efficient manner is to provide members of the crowd with the opportunity to exit the scene before force is used.

160.   DPD's policies with respect to dispersal orders recognize that it is important to warn members of a crowd that they may be subjected to force before employing such force.

161.   Officers in Denver customarily failed to record and/or document in writing such dispersal orders during the Protests.

162.   When the Denver Office of the Internal Monitor requested written documentation of all dispersal orders (as was contemplated by DPD Policy), the DPD responded that they could not locate **any** written statements that contain this information.

163.    The Denver Office of the Internal Monitor reviewed hundreds of hours of video from the Protests and observed dozens of situations in which the DPD used less-lethal munitions against crowds.

164.    The Denver Office of the Internal Monitor Dispersal found that dispersal orders were not given in most situations.  In most of those situations, the situation did not present any exigent circumstances that required the use of less-lethal munitions without an order to disperse.

165.    Even on the rare occasions when dispersal orders were given, Officers in Denver failed to warn protesters that they would be subjected to force and arrest if they remained, nor did they allow enough time and space for protesters to comply even if they wanted to.

166.    Officers in Denver did not provide any dispersal orders before employing force against protesters on May 30, 2020, at which Mr. Strong was injured, let alone an order that complied with DPD Policy.

167.    The effect of Officer in Denver's failure to provide dispersal orders or otherwise warn protesters of the imminent use of force is that numerous protesters, including Mr. Strong, were subjected to significant force without any warning or opportunity to protect themselves or otherwise avoid harm.

### iii.    DPD Policy Unconstitutionally Permits Officers in Denver to Use Force Against Protesters, Including "Less-Lethal" Munitions, Without Sufficient Justification

168.    Except for crowd control situations (discussed infra), Denver's Use of Force Policy restricts the use of "less-lethal" KIPs only in situations where (1) it is necessary to "incapacitate a combative or physically resistive person whose conduct

32

rises at least to the level of Active Aggression"; (2) "it is likely to prevent an officer or a third person from being seriously injured or killed" or (3) it is necessary to "incapacitate a suicidal person who cannot be safely controlled with other force options."

169.    Denver's Use of Force Policy defines Active Aggression as "a threat or overt act of an assault, coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is imminent."

170.    Denver's Use of Force Policy provides that "[u]nless lethal force is reasonable and necessary," an officer shall not target with a 40mm launcher "[t]he head, eyes, throat, neck, breasts of a female, genitalia, pelvis, or spinal column."   Rather, 40mm launcher's should be aimed "at areas of the body with large muscle mass."

171.    Denver's Use of Force Policy provides that "[u]nless lethal force is reasonable and necessary, an officer will not intentionally deploy the 40mm launcher from a range of less than five (5) feet."

172.    These Use of Force policies regarding 40mm launchers and less-lethal weapons demonstrate the danger such weapons pose to civilians, and the limited circumstances in which use of such weapons is justifiable.

173.    These Use of Force policies recognize the potentially deadly nature of such "less-lethal" weaponry, as it applies the heightened deadly force standard when they are used against sensitive body parts or within five feet of the target.

174.    Moreover, according to DPD's 2008 Crowd Management Manual, "40mm operators are responsible for every round they fire" and "[t]hey must ensure that innocent persons are not struck unintentionally."

175.    As such, DPD Policy demonstrates that 40mm rounds are extremely dangerous, particularly when targeting sensitive deadly parts, such as their use is only permitted where lethal force would be permissible, and that "innocent persons" are not targeted.

176.    These limitations and restrictions on the use of "less-lethal" weaponry appear reasonable except for one glaring exception.

177.    That exception is that the DPD Use of Force Policy allows DPD officers to employ a significantly more lenient standard on using "less-lethal" weaponry when such weapons are used to target "members of a crowd."

178.    Specifically, DPD Use of Force Policy permits DPD officers to employ less-lethal munitions against "members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic."

179.    This means that an officer may fire KIPs at members of a crowd for nothing more than disrupting traffic, despite the Policy recognizing the potentially deadly nature of such weaponry.

180.    The Denver Use of Force Policy thus unconstitutionally permits officers to deploy force that is grossly disproportionate to the need for force.

181.    As the Denver Office of the Independent Monitor observed, "striking someone directly with an impact projectile that could cause them serious harm during crowd control should be reserved for situations in which individuals are engaging in no less than active aggression."

182.   Mr. Strong, nor any person near him, was not engaged in conduct justifying the use of deadly or lethal force  when he was subjected to the use of deadly force by Defendant Bolton.

*iv.*   ***The Unlawful Actions of the Officers in Denver During the Protests Were Ordered by Denver's Final Policymakers and Subsequently Ratified by Them***

183.   Upon information and belief, Officers in Denver were given authority by Denver's final policymakers, including Mayor Michael Hancock and DPD Chief Paul Pazen, to use less-lethal weapons to shoot KIPs at protesters without warning.

184.   Upon information and belief, Officers in Denver were given authority by Denver's final policymakers, including Mayor Hancock and Chief Pazen, to use less-lethal weapons to shoot protesters in the head, face, neck, and chest, without need for any force, let alone deadly force.

185.   As described above, Officers in Denver repeatedly violated DPD's Use of Force Policy, as well as clearly established constitutional standards, by employing substantial force against peaceful protesters who were simply engaging in protected First Amendment activities.

186.   Officers in Denver repeatedly violated DPD's Use of Force Policy by targeting the head, neck, face, chest, and other sensitive body parts of peaceful protesters without the situation calling for the use of deadly force.

187.   Upon information and belief, no Officer in Denver has been disciplined for their conduct during the Protests, despite the myriad violations of Policy and/or the law that occurred.

188.    Defendant Officer Bolton has not been disciplined for shooting Mr. Strong in the face with a 40mm launcher without justification for the use of deadly force.

189.    Denver and its Policymakers' failure to discipline, supervise, and/or reprimand Officers in Denver for their repeated violations of DPD's Use of Force Policy sent a clear message to Officers in Denver that their use of force to suppress protests was consistent with Denver's customs, policies, practices, and training.

190.    Officers in Denver's repeated and flagrant violations of the Use of Force Policy demonstrates that Denver and its Policymakers failed to train Officers in Denver on this Policy  and/or that Denver trained Officers in Denver that they need not follow the Policy.

191.    The existence of the Use of Force Policy demonstrates that Denver and its Policymakers were on notice that it was necessary to restrict the use of less-lethal weapons, but that they were deliberately indifferent to the actions of Officers in Denver who customarily used less-lethal weapons without sufficient justification as to constitute excessive force under the Constitution.

192.    Given Officers in Denver's repeated uses of force against peaceful protesters at numerous locations and by different officers, Denver has a custom of using force against protesters who are not threatening the safety of officers or other members of the public but merely expressing messages that Officers in Denver did not like.

193.    The fact that Denver has failed to train Officers in Denver on the constitutional response to peaceful protest, despite the recurrent pattern of such officers using force in such situations, indicates a deliberate refusal by Denver to recognize and respect the constitutional rights of protesters.

194.    Denver failed to adequately train its officers regarding crowd management and crowd control techniques in a manner that does not violate citizens' constitutional rights. The training received by DPD officers does not comport with DPD's own written policies regarding crowd management and crowd control.

195.    During the George Floyd Protests, Denver's policy was that officers' uses of force during the protests did not need to be individually documented or reported, that individual officers had blanket authority to use 40mm munitions against individuals in the crowd as they saw fit, and that individual officers had discretion to turn their body worn cameras on or off as they saw fit. These policies predictably made it more difficult to hold officers accountable for their use of force during the protests and increased the risk that officers would use unwarranted and unjustified force against protesters.

196.    Defendant Bolton did not turn on his body camera prior to using deadly force against Mr. Strong.

197.    Chief Pazen and Mayor Hancock had substantial notice that Officers in Denver were freely employing "less-lethal" force against peaceful protesters, resulting in widespread violations of the protesters' constitutional rights.

198.    Such notice came from hundreds of citizen complaints about Officer in Denver's conduct, and widely publicized videos and eyewitness statements circulated through the local, state, national, and international press.

199.    Despite their notice of Officers in Denver's widespread use of excessive force, on the morning of May 29, 2020, Chief Pazen and Mayor Michael Hancock publicly praised Officers in Denver for their "tremendous restraint" during the protests.

200.    Chief Pazen and Mayor Hancock further remarked that Officers in Denver's use of "less-lethal" weapons against protesters was proper.

201.    Chief Pazen and Mayor Hancock ratified the unconstitutional conduct of Officers in Denver, as described above.

202.    In the days after Chief Pazen and Mayor Hancock publicly ratified the use of force against non-violent and unthreatening protesters, Officers in Denver continued to use "less-lethal" force indiscriminately, without provocation, and without warning.

203.    The day after Chief Pazen and Mayor Hancock publicly condoned the use of force against non-violent and unthreatening protesters, Defendant Officer Bolton shot Mr. Strong in the face, costing him his right eye.

204.    Denver's policy, practice, and custom of authorizing Officers in Denver to use "less-lethal" weapons to suppress peaceful protests was the moving force behind the violations of Mr. Strong's constitutional rights.

205.    Denver and its final policymakers have acted with deliberate indifference to the constitutional rights of protesters by authorizing the use of "less-lethal" force against protesters who do not pose any safety threat; by failing to train, supervise, and discipline officers regarding the proper use of force against protesters; and by failing to eliminate the custom of officers using "less-lethal" force against peaceful protesters.

## STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Violation of the First Amendment – Freedom of Speech and Assembly**
**(Against all Defendants)**

206.    Plaintiff hereby incorporates all other paragraphs of this complaint as if fully stated herein.

207.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

208.    Defendant Officer Bolton acted under color of state law, and within the course and scope of their employment, in their capacity as a law enforcement officer under Defendant Denver's authority and control at all relevant times.

209.    Plaintiff was engaged in First Amendment protected expression by participating in the May 30, 2020 protest at Civic Center Park.

210.    Defendants' use of excessive force against peaceful protesters, including Plaintiff, would chill a person of ordinary firmness from engaging in activity protected by the First Amendment.

211.    Defendants' use of excessive force against Plaintiff ended his ability to protest and chilled him from engaging in First Amendment activity.

212.    Plaintiff's expression was on a matter of public concern and did not violate any law.

213.    Plaintiff's expression occurred in a traditional public forum.

214.    Defendants' actions were motivated by the content and/or viewpoint expressed by Plaintiff and other protesters.

215.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

216.    Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to assemble and to speak out against police brutality.  Any reasonable law enforcement officer knew or should have known of this clearly established right.

217.    Defendant Officer Bolton engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights, and is therefore liable to Plaintiff for punitive damages.

218.    Defendant Denver's custom, policy or practice of permitting the use of "less-lethal" force against peaceful protesters is not a reasonable regulation of Plaintiff's First Amendment protected activities.

219.    Defendant Denver failed to properly train, supervise, and discipline its officers with respect to the First Amendment and the rights of persons to exercise their First Amendment rights.

220.    Defendant Denver was put on notice throughout the Protests that Officers in Denver were habitually and regularly violating the First Amendment rights of protesters.

221.    Based on the failure to discipline any Officers in Denver for the myriad violations of the First Amendment, Defendant Denver has a culture of tolerating and condoning violations of the First Amendment by its law enforcement officers, including Defendant Officer Bolton.

222.    The actions of Defendants were authorized by final policymakers for Defendant Denver, including Denver's Chief of Police Paul Pazen and Denver Mayor Michael Hancock.

223.    The actions of the Defendants were ratified by final policymakers for Defendant Denver, including by Chief Pazen and Mayor Hancock.

224.   Defendant Denver's customs, polices, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

225.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

226.   Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**First Amendment – Retaliation**
**(Against All Defendants)**

227.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

228.   Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

229.   Defendant Officer Bolton acted under color of state law, and within the course and scope of their employment, in their capacity as a law enforcement officer under Defendant Denver's control at all relevant times.

230.   Plaintiff engaged in First Amendment protected expression by participating in the May 30, 2020 protest at Civic Center Park.

231.   Defendants responded to Plaintiff's First Amendment protected activity by retaliating against him, including through the deployment of KIPs.

41

232.    Defendants' use of excessive force against peaceful protesters, including Plaintiff, would chill a person of ordinary firmness from engaging in activity protected by the First Amendment.

233.    By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence him, and to deter him from gathering and speaking in the future.

234.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights and the content and viewpoint expressed in his speech.

235.    At all relevant times, Plaintiff had a clearly established right under the First Amendment to be free from retaliation.  Any reasonable law enforcement officer knew or should have known of this clearly established right.

236.    Defendant Officer Bolton engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights, and is therefore liable to Plaintiff for punitive damages.

237.    Defendants' custom, policy, or practice of permitting the use of "less-lethal" force against peaceful protesters who convey a message that law enforcement does not like is not a reasonable regulation of Plaintiff's First Amendment protected activities.

238.    Defendant Denver failed to properly train, supervise, and train its officers with respect to the First Amendment, the rights of persons to exercise their First Amendment rights, and responding in a constitutional manner to a message that is critical of law enforcement.

42

239.    Denver was put on notice throughout the Protests that Officers in Denver were habitually and regularly retaliating against protesters for their constitutional exercise of their First Amendment rights.

240.    Based on the failure to discipline any Officers in Denver for the myriad acts of First Amendment retaliation, Defendant Denver has a culture of tolerating and condoning violations of the First Amendment by its law enforcement officers, including Defendant Officer Bolton.

241.    The actions of the Defendants were authorized by final policymakers for Defendant Denver, including Chief Pazen and Mayor Hancock.

242.    The actions of the Defendants were ratified by final policymakers for Defendant Denver, including by Chief Pazen and Mayor Hancock.

243.    Defendant Denver's customs, polices, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

244.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

245.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983**

43

**Fourth and Fourteenth Amendment – Excessive Force**
**(Against All Defendants)**

246.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

247.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

248.     Defendant Officer Bolton acted under color of state law, and within the course and scope of their employment, in their capacity as a law enforcement officer under Defendant Denver's control at all relevant times.

249.     At all relevant times, Plaintiff had a clearly established constitutional right under the Fourth and Fourteenth Amendments to be secure in his person against unreasonable seizures through excessive force.  Any reasonable law enforcement knew or should have known of this clearly established right.

250.     At the time Defendants employed force against Plaintiff, Defendants had no warrant, probable cause to arrest, or any other valid basis to seize Plaintiff.

251.     Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of KIPs.

252.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

253.     Plaintiff did not pose any threat to Defendants or others that could have justified the use of force against him.

254.     No person in the crowd near Plaintiff posed any threat to Defendants or others that could have justified the use of force against the crowd.

255.     Defendant Officer Bolton engaged in the actions, as described herein, intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a

reckless disregard for, Plaintiff's constitutionally protected rights, and is therefore liable to Plaintiff for punitive damages.

256. Defendant Denver had a custom, policy, or practice of permitting Officers in Denver to use "less-lethal" force against protesters, including those, like Plaintiff, who posed no threat to the safety of DPD officers or others.

257. Defendant Denver had a custom, policy, or practice of permitting Officers in Denver to use "less-lethal" force against protesters for no lawful reason at all.

258. Defendant Denver had a custom, policy, or practice of permitting Officers in Denver to target peaceful protesters, including Mr. Strong, in the head, neck, face, and chest with KIPs.

259. Defendant Denver had a custom, policy, or practice of permitting Officers in Denver to use force against peaceful protesters without providing them with any warning of the imminent use of force or the opportunity to disperse.

260. Defendant Denver was put on notice throughout the Protests that Officers in Denver were habitually and regularly violating the Fourth and Fourteenth Amendment rights of protesters.

261. Based on the failure to discipline any Officers in Denver for the myriad violations of the Fourth and Fourteenth Amendments, Defendant Denver has a culture of tolerating and condoning violations of the Fourth and Fourteenth Amendments by its law enforcement officers, including Officer Bolton.

262. The actions of the Defendants were authorized by final policymakers for Defendant Denver, including Chief Pazen and Mayor Hancock.

263.    The actions of the Defendants were ratified by final policymakers for Defendant Denver, including by Chief Pazen and Mayor Hancock.

264.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

265.    Defendant Denver failed to properly supervise and/or train its officers on the Fourth and Fourteenth Amendments, including but not limited on the use of force against members of a crowd who pose no danger to law enforcement or others.

266.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

267.    Defendants' actions and omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

268.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in

his favor and against each of the Defendants, and award him all relief allowed by law,

including but not limited to the following:

A.      All appropriate relief at law and in equity;

B.      Injunctive relief, including:

      a.      Enjoining Defendant Denver's officers (and those under its control)
from shooting projectiles indiscriminately into crowds of people
exercising their rights of free speech, assembly, and petitioning of
grievances;

      b.      Enjoining Defendant Denver's officers (and those under its control)
from shooting projectiles at protesters unless there is an immediate
threat of bodily injury to law enforcement officers or others;

      c.      Enjoining Defendant Denver's officers (and those under its control)
from using force without warning against protesters;

      d.      Enjoining Defendant Denver's officers (and those under its control)
from using pepper ball and 40mm launchers under any
circumstances during protests or demonstrations unless they have
been trained and certified to use such weaponry.

      e.      Requiring that Defendant Denver's officers (and those under its
control) have their badges and badge numbers prominently
displayed and easily visible on the exterior of their uniforms or
protective gear; and prohibiting officers from removing their badges
or otherwise obstructing their visibility

      f.      Requiring that all Defendant Denver officers (and those under its
control) deployed to protests or demonstrations have their body-
worn cameras recording at all times; and forbidding officers from
intentionally obstructing the camera or recording;

      g.      Requiring that all Defendant Denver officers (and those under its
control) deployed to protests or demonstrations promptly create a

47

use of force report whenever they deploy KIPs, or any other less-than-lethal weapon;

h.    Requiring that Defendant Denver's officers (and those under its control) only give orders to disperse when there is an imminent danger of harm to persons (not property);

i.    Requiring that any and all orders by Defendant Denver's officers (and those under its control) to disperse must be followed by adequate time for the intended audience to comply, and officers must leave room for safe egress; if it appears the intended audience did not hear the order, the order must be repeated multiple times before the crowd is dispersed;

j.    Requiring Defendant Denver to develop mutual aid agreements with neighboring jurisdictions that address potential crowd control assistance.  Such agreements should specify the circumstances under which assistance may be requested and provided, acceptable request methods, forms of assistance to be provided, and an agreed upon command and control structure;

k.    Requiring that Defendant Denver require any of its mutual aid partners to adhere to the DPD's Use of Force Policy, and to utilize only types of weapons and munitions approved for use by the DPD;

l.    Requiring Defendant Denver to amend the DPD's Operation and Crowd Management Manuals to require the collection of data regarding any response to protest or demonstration, including tracking rosters of the officers deployed, and the distribution and deployment of all less-lethal munitions used.

C.    Declaratory relief and other appropriate equitable relief;

D.    Economic losses on all claims as allowed by law;

E.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

F.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

G.      Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

H.      Pre-and post-judgment interest at the lawful rate; and

I.       Any other appropriate relief at law and equity that this court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: May 23, 2022

RATHOD | MOHAMEDBHAI LLC

*s/ Felipe Bohnet-Gomez*
Felipe Bohnet-Gomez
Matthew J. Cron
Ciara Anderson
Siddhartha H. Rathod
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (phone)
(303) 578-4401 (facsimile)
fbg@rmlawyers.com
mc@rmlawyers.com
sr@rmlawyers.com

*Attorneys for Plaintiff*